**UNITED STATES of America**

v.

**Rhonda M. FARRAH**

**No. CRIM. 3:98CR146 AWT.**

United States District Court, D. Connecticut.

Jan. 16, 2001.

shall not be liable for claims for contribution regarding matters addressed in the settlement. . . .

James G. Genco, U.S. Attorney's Office, Hartford, CT, Barbara Bailey Jongbloed, Stephen C. robinson, U.S. Attorney's Office, New Haven, CT, for U.S., plaintiff.

F. Lee Bailey, Boston, MA, Kenneth J. Fishman, Fishman, Ankner & Horstmann, LLP, Boston, MA, Amy J. Horowitz, Horowitz, Spicer & Tallo LLC, Hartford, CT, Gerald B. Lefcourt, Law Offices of Gerald B. Lefcourt, PC, New York City, Donald B. Marks, Marks & Brooklier, Los Angeles, CA, for defendant.

### RULING ON MOTION FOR NEW TRIAL

THOMPSON, District Judge.

Defendant, Rhonda M. Farrah, having been found guilty by a jury on all charges, moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. She contended (i) that her trial counsel had an undisclosed conflict of interest arising from his involvement in other litigation against the government; (ii) that there was a total breakdown of the attorney-client relationship during the trial; (iii) that her trial counsel rendered ineffective assistance during the trial; and (iv) that the court failed to made an adequate inquiry into potential conflicts of interest at an *in camera* hearing held on the morning trial commenced. For the reasons that follow, the defendant's motion was denied, after an evidentiary hearing.

### I. *FACTUAL BACKGROUND*

In August 1998, Rhonda M. Farrah was indicted by a Federal grand jury sitting in Hartford on charges of wire fraud, money laundering and federal income tax evasion. She was arrested in California in September 1998. She first appeared in this district on October 13, 1998, was released on a personal recognizance bond and returned to her home in California.

Farrah was initially represented by counsel from San Jose, California but terminated that relationship because she became dissatisfied with that counsel. With the assistance of Attorney Barry K. Rothman, of Los Angeles, who she refers to as her "general counsel," Farrah retained Attorneys F. Lee Bailey and Kenneth J. Fishman to represent her. Bailey was based in Florida, and Fishman had his offices in Boston. Farrah retained Bailey and Fishman as co-counsel subsequent to a lengthy meeting on October 3 in Orlando, which was attended by the three of them and Rothman. Although Fishman has extensive experience in criminal defense, has been practicing criminal law for over 20 years and is highly skilled, it was understood that Bailey would be the lead counsel at trial. On December 2, 1998, Bailey and Fishman entered appearances on the defendant's behalf.

Several months of discovery followed, during which time the government gave the defendant's counsel "open file" access to all documents obtained by the government in the case. Reports of interviews with witnesses were also provided months in advance of trial. Throughout the discovery period, most of the government's contacts with the defendant's defense team were principally with Fishman, although Bailey was also in contact with government counsel. Also, the defense team employed the services of a private investigator from Florida, Patrick McKenna, who

contacted and interviewed numerous government witnesses, including the victims.

In May 1999, a hearing was held on the defendant's motions to suppress evidence and to dismiss the indictment. At that hearing, two government witnesses testified and were cross-examined by Bailey. Fishman was also present in court assisting with the hearing. Farrah's attorneys appeared to be well prepared and advocated her position skillfully and zealously. The defendant's motions were, nonetheless, denied.

Jury selection had been scheduled for October 16, 1999. On September 16, Farrah moved for a continuance because Bailey's wife, who had been battling cancer for approximately one year, had passed away on September 12. Bailey had been unable to prepare for the trial or attend to other professional matters "in recent weeks" because of his wife's condition. (Mot. to Cont. Trial Date (doc. # 50) at 1). A continuance of approximately 30 days was requested, and it was granted.

On October 15, the court dismissed, upon the government's motion, four counts in the indictment that related to victims Thomas Black and William Sundin. The government had concluded that an individual who would be called to testify in connection with those counts, Danny Boone, was not a credible witness. This fact was reported to the court and to defense counsel.

The jury was selected on November 12, 1999, and trial was scheduled to commence on November 29, which was the Monday after Thanksgiving.

On November 24, Farrah faxed, or caused to be faxed, a letter to the court, *ex parte*. The letter was dated November 23, 1999, and the fax trailer indicated that it had been faxed from Rothman's fax machine. In this letter, Farrah stated that she had lost confidence in Bailey and Fishman and listed nine reasons:

1. There is a fundamental difference of opinion as to which witnesses will testify at trial, such as Marilyn Poling and Connie Haig.

2. I have asked for months that Mr. Bailey's private investigator do certain things, which on the eve of trial have still not been done, such as background information on Donald Poling and Robert Fradette.

3. No diligent search has been made for an expert witness who can testify that based on representations made to me by Daniel Boone, who represented himself as an attorney, that a reasonable person would reasonably believe in good faith that an investment program for prime bank guarantees does exist.

4. Daniel Boone, who has pleaded guilty, with a plea agreement in exchange for 5 years probation and $352,000.00 restitution to the victims, delivered a box of documents to Mr. Genco. Although available for review at Mr. Genco's office, my counsel has never fully reviewed, nor asked Mr. Genco to copy the documents for my review, which I believe to be crucial to my defense.

5. There is a letter from Marilyn Poling to me stating that if I did not return $100,000.00 she would see to it that I was jailed and lose custody of my 14 year old daughter. I believe this to be extortion. My attorneys have refused to produce the letter at trial.

6. My attorneys have never explored with me my state of mind regarding my "lack of willfulness" regarding tax evasion charges.

7. During the last week Mr. Bailey has failed to return my telephone calls and failed to call me when promised.

8. The only opportunity I have been given to meet with Mr. Bailey, Mr. Fishman and Mr. McKenna, the private investigator, together, is Sunday evening, November 28th, the evening before trial. I asked to start the meet-

ing on Saturday, November 27th, but my attorneys were unavailable.

9. My attorneys have told me that there is no specific trial strategy for my defense until they see the government's case, although, prior to trial full disclosure has been made by the government regarding its case.

Def.'s Letter (doc. #77) at 2–6. She also stated:

Today, November 23, I requested Mr. Bailey and Mr. Fishman file a motion with the Court to be relieved as Counsel based upon the differences we have. Although they both originally agreed to do so, approximately 30 minutes later they changed their mind, and refused to file a motion to be relieved because they felt the motion could be used against them at some time in the future if the attorney client priviledge [sic] was waived. I feel my attorneys are now putting their interests above my interests as their client, and I feel a conflict of interest exists, and that I am compelled to write this letter.

*Id.* at 6–7. Farrah concluded by asking the court to relieve Bailey and Fishman and grant her a continuance to January 2000 so that she could engage new counsel.

The court determined the availability of Farrah and her counsel for an *in camera* hearing and scheduled the hearing for early morning on Monday, November 29, the first day of trial. At that hearing, there was a discussion of the issues raised in Farrah's letter, including those set forth in the nine numbered paragraphs. The discussion included the issues related to Farrah's concern, also expressed in her letter, that her lawyers were putting their interests ahead of hers. In addition, Rothman produced a copy of a complaint by the Florida bar against Bailey and indicated that he thought it raised a potential conflict of interest because the assertions against Bailey in the Florida bar complaint were similar to the charges against Farrah. Farrah added that a "bigger problem" was that Bailey's attention to the

Florida bar complaint and other personal affairs had been distractions that resulted in him being inattentive to her case.

The court inquired of Bailey, who informed the court that the Florida bar complaint related to events occurring in 1996, when he was jailed by a federal judge for failing to timely produce an accounting for certain shares of stock that had been delivered to Bailey to hold in trust for the government. The events that occurred in 1996 had arisen out of Bailey's representation in 1994 of the defendant in *United States v. Duboc*, a federal criminal prosecution in the Northern District of Florida. After Duboc pled guilty to crimes that involved importing illegal drugs, the stock had become subject to forfeiture as proceeds of criminal activity.

Bailey informed the court further that an investigation by the Florida bar into Bailey's conduct in that matter commenced in 1996 but nothing had happened until the summer of 1999, when activity in the matter started up again. Bailey expected that the matter would be tried in the first half of calendar year 2000. He was represented by prominent counsel and felt comfortable about the proceedings. Except for working on an answer to the complaint, Bailey had devoted no time to the matter and did not plan to do so until Farrah's trial was over.

The court found credible Bailey's representation concerning the Florida bar complaint and concluded that Bailey did not have a conflict of interest arising out of the Florida bar proceeding and that its pendency, even in combination with circumstances in his personal life, had not resulted in him being inattentive to Farrah's case.

At the *in camera* hearing, the court also found unpersuasive the other arguments made by Farrah. As to the points Farrah raised in the paragraphs numbered 1 through 9 of her letter, the court determined either (i) that Farrah was attempting to impermissibly substitute her judg-

ment, and/or that of Rothman, for the judgment of her counsel as to how to prepare for and try the case and that in some instances her statements as to the facts were misleading or untrue, or (ii) that Bailey and Fishman's explanation was quite reasonable. As to Farrah's claim that a conflict existed because Bailey and Fishman were putting their interests above her interests as the client, the court credited Bailey's and Fishman's explanation as to why they had declined to furnish Farrah with the affidavit she had requested. Defense counsels' actions vis-à-vis Farrah's request were reasonable and appropriate.

In addition, Rothman asserted that the fact that defense counsel was deferring making an opening statement, if at all, until after the government rested its case was evidence that Bailey and Fishman were not adequately prepared. However, that was not true. This was a strategic decision to be made by defense counsel, who, having been unsuccessful in opposing the government's motion for permission to give an opening statement, made a reasonable decision to ask the court for a special instruction to the jury that was keyed to their assessment of the case.

Rothman also asserted at one point during the *in camera* hearing that Farrah had as of that point in time no working relationship with Bailey and Fishman. That assertion was untrue, and as is discussed below, never became true at any time prior to the end of the trial. Farrah was unhappy about proceeding to trial with Bailey and Fishman as her counsel but not because there had been a breakdown in communication or because there was no effective communication. The problem was that Farrah did not like what she was hearing as a result of the communications. She was being told that things that she thought would be helpful to the defense would not, in fact, be helpful, and that her defense counsel would not change their trial preparation routine to accommodate her desires in terms of a meeting. While

these disagreements had resulted in a relationship that could not be termed "good" as of the time of the *in camera* hearing, all the hostility displayed at the hearing came from the side of the table occupied by Farrah and Rothman. Both the substance and the tone of the responses by Bailey and Fishman were highly professional and, particularly in light of the tone and demeanor of Farrah and Rothman, exceedingly civil.

Farrah's motion was denied at the end of the *in camera* hearing, and the trial commenced promptly thereafter. The defense was handled by both Bailey and Fishman, although the former clearly took the lead in cross-examining the government's witnesses and presenting the defense. Fishman continued to handle most of the discovery issues and appeared to be responsible for legal research. There was no indication at any time that either of the defense counsel was other than completely prepared. Bailey, in fact, conducted lengthy examinations without the benefit of notes, which was consistent with his representation at the *in camera* hearing as to why it was not appropriate for him to change his schedule on the Saturday before trial commenced to meet with Farrah and Rothman because he needed to spend that time memorizing information.

Given the events that preceded the trial, the court took special note of what the relationship between Farrah and her counsel appeared to be. There was never any indication that the relationship was other than good. Farrah and her defense counsel communicated with each other and it appeared to be cordial on both sides.

In connection with Farrah's motion for a new trial, Rothman filed an affidavit stating that there was a total breakdown of any meaningful communication between Farrah and Bailey and Fishman during the trial. Based on Rothman's affidavit, the court granted Farrah's request for an evidentiary hearing. Rothman, Baily and Fishman testified at that evidentiary hearing. Also, in response to an inquiry from

the court, Farrah represented that she did not disagree, in any significant detail, with anything in Rothman's testimony.

The court has concluded that notwithstanding Farrah's and Rothman's assertions to the contrary, there was an effective working relationship between Farrah and Bailey and Fishman during the trial. Farrah, Rothman, Fishman and Bailey had dinner together most evenings during the trial, although Bailey arrived late for dinner and left early. After dinner Rothman and Farrah wanted to join Bailey and Fishman in their suite to discuss the case but, except on one occasion, were excluded because the defense team wanted to prepare for the next day's proceedings. One evening, however, Farrah and Rothman spent three hours with Bailey, Fishman and McKenna going over four boxes of what have been referred to as the Danny Boone documents.

During the government's case, Farrah and Rothman were complimentary about Bailey's performance on the important cross-examinations.

Farrah and/or Rothman on her behalf also discussed with Bailey and/or Fishman various other matters about which they disagreed with Bailey as to how the matter should be handled. They discussed the cross-examination of government witness Robert Fradette. There were several discussions during the trial about the two agreements to which victim and government witness Donald Poling was a party, and, in fact, Rothman testified that as a result of his conversation with Bailey, those agreements were introduced by the defense as exhibits, although Rothman contends that Bailey did not make a sufficient argument based on those agreements. They also discussed the issue of the opening statement a couple of times.

During the course of the trial there continued to be discussions between Bailey and Farrah and/or Rothman as to whether certain individuals should be called as defense witnesses. Farrah disagreed with Bailey's determination that it would be more detrimental than helpful to the defense to call certain individuals as witnesses. For instance, Farrah and Rothman appeared to believe, erroneously, that certain witnesses would be allowed to testify as to what was in Farrah's mind, namely, that Farrah believed in the existence of "prime bank guarantees."

Moreover, at the end of the government's case, Bailey and Fishman had a discussion with Farrah as to how the defense would proceed. They discussed witness-by-witness the reasons for and against producing each potential defense witness. Defense counsel felt that the downside outweighed the upside, in almost every case, although for varying reasons. Farrah and Rothman disagreed.

On some occasions when defense counsel discussed matters with Farrah and Rothman, Farrah would respond intelligently and appear to understand defense counsel's thinking, but then resurrect the issue a few days later.

Rothman stated in his affidavit that Bailey and Fishman refused to discuss trial strategy. Also, Rothman contends that Bailey and Fishman had a duty to discuss their trial strategy not only with Farrah but also with Rothman. During the trial, Rothman, in fact, inquired repeatedly about what the defense strategy was. He was told at every point what defense counsel would be doing. However, Farrah and Rothman were not satisfied. Bailey and Fishman, with Bailey taking the lead, had adopted what Bailey termed a "defensive position," versus a strategy. They explained to Farrah and Rothman that they would have to wait and see how the government's case went and then determine how best to respond to it, if at all. Farrah and Rothman found this approach unacceptable. They appeared to desire a commitment to a specific strategy.

Deferring the decision as to whether to give an opening statement was consistent with this approach of not committing to a

specific strategy before the close of the government's case.

Farrah contends that this approach was intended to camouflage a lack of advance preparation by Bailey and Fishman. It is difficult to see how this argument can be made in good faith. Farrah was present at the hearing on the motion to suppress, where it was apparent that defense counsel knew the case well. She knew that McKenna, the investigator, was at work, interviewing prospective witnesses around the country, commencing early in the case and continuing into the trial. Also, based on Farrah's own statements, it is evident that defense counsel knew the case well enough before trial commenced that they could have fundamental differences of opinion with Farrah as to which witnesses should testify at trial.

Farrah also contends that Bailey and Fishman rendered ineffective assistance at trial. She points to five critical areas.

First, she argues that Bailey failed to cross examine victim Donald Poling regarding two joint venture agreements executed by Poling. She claims that the two agreements were mutually exclusive, and one or the other were to be operative at the discretion of the defendant, and that under one of the joint venture agreements, Poling simply purchased a part of Farrah's deal with Danny Boone, rather than making an investment, as contended by the government. However, Bailey, in fact, cross examined Poling extensively concerning the two joint venture agreements, the differences between the two documents, and whether he was, in fact, a joint venturer sharing the risk with Farrah, as opposed to an investor.

Second, Farrah points to defense counsel's failure to call an expert witness to refute the government's expert witness on the issue of money laundering. The only insight as to why Farrah contends Bailey and Fishman failed to adequately represent her in this respect was offered by Rothman, when he testified at the evidentiary hearing. Rothman was asked what the substance of the defense's money laundering expert's testimony would be. He responded that this defense expert would have given general testimony as to the existence of prime bank guarantees. This subject had nothing to do with the testimony of the government's money laundering expert. Rather, it was related to the government's other expert witness, who testified as to certain technical terms and concepts related to financial or investment instruments, and stated that there was no such instrument as a prime bank guarantee.

Third, Farrah contends that her defense counsel failed to adequately represent her because they failed to offer evidence that money received by the defendant went into the DenJon account at Nations Bank. She failed to specify, however, why any such failure constituted a failure to adequately represent her.

Fourth, Farrah contends that Bailey's failure to make an opening statement at any time during the trial constituted a failure to adequately represent her. As discussed above, defense counsel made a reasonable judgment to defer a decision as to whether to make an opening statement until the close of the government's case. It appears that at the time the defense commenced its case, defense counsel considered Danny Boone and Pamela Belden to be the only potential defense witnesses of substance, the defense's strategy in calling Donald Poling being impeachment based on actions he purposefully held off taking until after his cross examination by defense counsel had concluded. As noted above, the government had previously concluded that Boone was not a credible witness; defense counsel were aware of this fact. The court had ruled that the defense could call Boone as a witness, over the strenuous objection of the government, after a hearing on that issue. Boone arrived to testify, accompanied by his attorney. It did not appear that defense counsel could have predicted with a high degree of confi-

dence precisely what Boone's testimony would turn out to be in all material respects. Also, as to Belden, it appears that Bailey had not made a final decision as to whether to call her. Farrah simply states, as if it were an established legal principle, that failure to make an opening statement at any time constitutes ineffective assistance of counsel. She fails to give any analysis as to why under the circumstances of this case, as they were at each of the two points where an opening statement could have been given, failure to give one constituted a failure to adequately represent her interests. On the other hand, Rothman confirmed at the *in camera* hearing that Fishman had explained that there is a danger in giving an opening statement in that you might commit to the jury in an opening statement to do something and then later decide that it was not a good idea to do it. Also, Bailey explained that he did not like to make an opening statement unless certain criteria, which he specified, were satisfied. He felt that this case was unsuitable for an opening statement, at any phase of the case, because none of his criteria were satisfied.

Fifth, Farrah contends that defense counsel failed to adequately represent her because they failed to cross examine government witness Robert Fradette as to his fifty percent interest in Broadreach West, Ltd., which Farrah claims was evidenced by corporate documents executed by Fradette and by signatory cards showing Fradette as an authorized signer on the corporate accounts. Bailey testified at the evidentiary hearing that he was very anxious to get Fradette off the witness stand. While Bailey saw that there was documentation that could be pointed to in support of Farrah's contentions, he saw no useful purpose to be served by pursuing this line of inquiry because no document suggested that Fradette knew anything about the receipt or expenditure of the funds of the victims. Moreover, Bailey believed that Fradette came across as being truthful.

Farrah also contends that her defense counsel failed to investigate Pamela Belden, Larry Lile and Kenneth Kristan and, consequently, failed to call these individuals, who were critical witnesses, in her defense. However, Belden and Kristan were both interviewed by McKenna in Oregon during the early stages of the case. In addition, Belden was brought in from Oregon during the defense portion of the case, because defense counsel expected, based on McKenna's interview of her, to have her testify. On the day Belden was to testify, she had lunch with Bailey, Fishman and Rothman to discuss the case. Bailey then decided that her potential value to the defense was outweighed by a contradiction which flew in the face of the defense he planned to argue, and ultimately argued, to the jury, because most of Belden's value to the defense related to the Sundin and Black counts, which had been dismissed by the government prior to trial.

Bailey had previously concluded that Kristan would, on balance, be harmful to the defense case. Lile had been summoned as a potential witness for the hearing on the motion to suppress in May 1999. At that time, both Bailey and McKenna spoke with him. At the time of the trial, Bailey had decided that it was not in the best interests of the defense case to call Lile as a witness because of Lile's demeanor, his inability to give straight, logical or credible answers to questions, and the fact that he contradicted the defense on a very important point.

Rothman testified that Bailey's decision not to call Belden as a witness was based on the color of Belden's hair and that Bailey's decision not to call Lile as a witness was based on the fact that Lile is overweight. The court did not credit Rothman's testimony.

Farrah also contends that Bailey and Fishman failed to present an effective defense for the federal income tax evasion counts. She asserts that defense counsel failed to show that corporate tax returns

supported Farrah's contention that she did not willfully evade, or willfully attempt to evade, federal taxes. However, there is no evidence that any such corporate tax returns exist. Farrah's current defense counsel made reference to such corporate tax returns in the defendant's sentencing memorandum. The court inquired as to whether those corporate tax returns were in the record and was informed by Farrah's current defense counsel that they were not. The government then informed the court that, in response to the defendant's sentencing memorandum, the government had asked for the names of the companies and was never given even the names of the companies, much less copies of the corporate tax returns. When the court inquired of current defense counsel as to what his representation in the sentencing memorandum was based on, his response was artful, but led the court to conclude that no such corporate tax returns exist.

During the period from October 18 to 29, 1999, Bailey was involved as a party in the matter of *United States v. McCorkle et al.* in federal court in the Middle District of Florida. Bailey had represented William and Chantel McCorkle in connection with, *inter alia*, the seizure of their property by federal agents and the prosecution of the McCorkles and others on charges of mail fraud, wire fraud and money laundering. Certain funds of the McCorkles had been placed in a legal trust fund in a bank account in the Cayman Islands. The government seized these funds and filed a civil forfeiture action. Bailey asserted that he had an interest in the funds and withdrew funds out of the account for payment of a legal fee and litigation expenses. The October 1999 evidentiary hearing was on all matters relating to Bailey's withdrawal of funds out of the account in the Cayman Islands.

Farrah contends, in the instant motion, that proceedings in the *McCorkle* case inordinately consumed and substantially preoccupied Bailey's attention, thereby de-

priving Farrah of effective pre-trial preparation and trial performance on Bailey's part. In support of that argument, she contends that Bailey purposefully and intentionally omitted disclosing to the defendant and to the court, at the November 29 *in camera* hearing, his involvement in the *McCorkle* proceedings. Farrah also suggests that Bailey failed to aggressively defend her because he was concerned there might be reprisals against him and his clients in the *McCorkle* proceeding. However, there is no evidence that even tends to support these assertions by Farrah.

The only pertinent evidence is to the contrary. Bailey was represented by an attorney at the *McCorkle* hearing, and although Bailey testified at the hearing, he did not spend any significant amount of time in preparation for the hearing. Moreover, Rothman knew at or about the time of the hearing that Bailey was involved in the *McCorkle* hearing because the two of them had casual conversations about it and the matter was highly publicized. As to the failure to disclose to the court the proceedings in *McCorkle,* there was no logical reason why such a disclosure would have been appropriate since the *McCorkle* proceedings were not interfering with Bailey's ability to devote proper time or attention to Farrah's case and the assertion that Bailey was concerned about reprisals against him and the McCorkles if he aggressively defended Farrah is completely without foundation.

Farrah also argues that the United States Attorney for this district had a duty to disclose to this court the fact that Bailey had been involved in the *McCorkle* hearing in October 1999. This contention on Farrah's part is also completely without foundation.

The court notes that in January 2000, the magistrate judge who conducted the hearing in *McCorkle* found for the government on all the key issues and recommended that the district court issue an order for Bailey to comply with an earlier

order of that court and also show cause why he should not be imprisoned for civil contempt, pending compliance. Farrah quoted from the magistrate judge's recommended ruling, presumably in an effort to attack Bailey's credibility. This court, however, made its own judgments as to credibility.

## II. *DISCUSSION*

### A. *Claims Re the McCorkle and Duboc Cases*

Farrah contends that the proceedings in the *McCorkle* case inordinately consumed and substantially preoccupied Bailey's attention, thereby depriving Farrah of effective pre-trial preparation and trial performance on Bailey's part, and contends further that Bailey purposefully and intentionally omitted disclosing his involvement in the *McCorkle* proceedings both to the defendant and to the court. Farrah contends also that Bailey failed to aggressively defend her because he was concerned there might be reprisals against him and his clients in the *McCorkle* proceeding. As discussed above, there is no factual basis for any of these assertions, and they require no further discussion.

 However, Farrah also argues that she has established that, *per se*, she received ineffective assistance of counsel, based on Bailey's involvement in the *McCorkle* and *Duboc* cases. Farrah points to two narrow categories of cases where the Second Circuit has applied a *per se* rule, namely, "when unknown to the defendant, counsel was, at the time of the representation (i) not duly licensed to practice law because of a failure to meet the substantive requirements for the practice of law, and (ii) implicated in the defendant's crimes". *United States v. Rondon,* 204 F.3d 376, 379 (2d Cir.2000) (citation omitted). In *Rondon,* the court explained that these are narrow exceptions:

> Since we first recognized the *per se* rule in *Solina v. United States,* 709 F.2d 160

(2d Cir.1983), we have had many occasions to consider whether circumstances warrant application of the rule. To date, however, we have applied the *per se* rule in only two situations: when, unknown to the defendant, counsel was, at the time of representation, "(1) not duly licensed to practice law because of a failure ever to meet the substantive requirements for the practice of law, *see United States v. Novak,* 903 F.2d 883, 890 (2d Cir.1990); *Solina v. United States,* 709 F.2d 160, 167 (2d Cir.1983), or (2) implicated in the defendant's crimes, *see United States v. Cancilla,* 725 F.2d 867, 870 (2d Cir.1984) (en banc) (parentheticals omitted)"; *accord Hurel Guerrero v. United States,* 186 F.3d 275, 279 (2d Cir.1999); *see also Tippins v. Walker,* 77 F.3d 682, 688–89 (2d Cir. 1996) (stating that when counsel sleeps through critical portions of a trial, it may constitute per se ineffective assistance of counsel). In every other situation, we have refused to apply the *per se* rule. *See Hurel Guerrero,* 186 F.3d at 279–81 (counsel suspended from practicing in federal district court, but admitted in New York State and Puerto Rico); *Bellamy,* 974 F.2d at 306–08 (counsel suspended from practice after trial based on pretrial admission of mental and physical incapacity); *Kieser v. People of State of New York,* 56 F.3d 16, 17–18 (2d Cir.1995) (per curiam)(counsel not admitted to practice *pro hac vice* in New York and, at arraignment, temporarily suspended from practice in New Jersey for failure to pay bar dues); *United States v. Eisen,* 974 F.2d 246, 264–65 (2d Cir.1992) (counsel disqualified from appearing in an unrelated case at the time of trial); *United States v. Aiello,* 900 F.2d 528, 530–32 (2d Cir.1990) (counsel under investigation, and eventually indicted, in another district for tax evasion and other offenses); *Waterhouse v. Rodriguez,* 848 F.2d 375, 382–83 (2d Cir. 1988) (counsel disbarred during pretrial proceeding, but withdrew after becoming aware of disbarment). Moreover,

even in the two situations where we have found the *per se* rule applicable, we have resorted to it "without enthusiasm." *Solina,* 709 F.2d at 169; *see Hurel Guerrero,* 186 F.3d at 279 ("We have consistently acknowledged ... that we are disinclined to resort to [the] *per se* rule."); *Waterhouse,* 848 F.2d at 383 ("[W]e have never purported to expand applicability of the rule beyond the sort of egregious conduct present in *Solina* and *Cancilla.*"); *see also Tippins,* 77 F.3d at 686 ("We are reluctant to extend a rule of *per se* prejudice in any new direction.").

*Id.* at 379–80. Farrah does not contend that Bailey was not duly licensed to practice law at the time of the representation or that Bailey was implicated in her crimes. Rather, she urges the court to extend the *per se* rule to a situation where, Farrah contends, Bailey failed to disclose a material conflict to both his client and the court.

█ Farrah argues that "Bailey's *McCorkle* and *Duboc* difficulties, which involve federal money laundering charges, are identical to the charges leveled at the defendant." (Def.'s Mot. (doc. # 139) at 26). She refers to Bailey's involvement in those cases as "Bailey's money laundering problems." *Id.* This is a gross mischaracterization. In *McCorkle,* Bailey defended clients against federal money laundering charges, and in *Duboc,* against drug charges. In both cases, Bailey became personally embroiled in litigation related to the forfeiture of his client's assets. But while Bailey had difficulties that arose out of each of the cases, but they were not problems that could be·fairly characterized as "money laundering problems." As discussed above, as of the time of the trial, Bailey had, in connection with the *Duboc* case, been jailed for contempt several years earlier and was facing serious charges brought against him by the Florida bar, which had the potential for leading to his disbarment, and in connection with *McCorkle,* recently finished an evidentiary

hearing, which eventually led to a recommendation by a magistrate judge in January 2000 that a district court order him to show cause why he should not be jailed for civil contempt. Bailey was not investigated for, much less charged with, laundering money. He had merely represented people, who like Farrah, were charged with money laundering. Thus, the factual predicate on which Farrah bases her argument that she has made a showing that there was *per se* ineffective assistance of counsel does not exist.

The government notes, quite properly, in response to Farrah's contention that Bailey had such a conflict of interest, that Farrah was represented by two highly-skilled defense counsel throughout the pre-trial and trial stages of this case. Farrah makes no claim that Fishman at any time had a conflict of interest arising out of the *McCorkle* or *Duboc* cases. Nor is there any indication that Fishman was hampered in any way by an actual or potential conflict of interest arising out of the *McCorkle* or *Duboc* cases or that, at any time, he failed to fully discharge his professional responsibilities to his client, Farrah.

### B. *Total Breakdown of Attorney–Client Relationship*

█ Farrah contends that there was a total breakdown of the attorney-client relationship prior to and during trial because there was no effective communication between her and her counsel, and that this constitutes grounds for a new trial. Farrah relies on *United States v. Moore,* 159 F.3d 1154, 1158 (9th Cir.1998), where the court stated that a "defendant need not show prejudice when the breakdown of a relationship between attorney and client from irreconcilable differences results in a complete denial of counsel." The court in *Moore* noted, however, that a defendant "is not entitled to a particular lawyer with whom he can, in his view, have a 'meaningful attorney-client relationship.'" *Id.*

█ Here, however, there was no breakdown of effective communication be-

tween Farrah and her defense counsel, much less a breakdown in the relationship that resulted in a denial of counsel. Although Farrah and Rothman disagreed with the decisions made by Bailey and Fishman concerning which witnesses should be called to testify at trial, and other strategic and tactical decisions as to conducting Farrah's defense, the fact of the matter is that these points were discussed with the client. Moreover, the matters about which they disagreed were matters that were properly decided by Bailey and Fishman.

> The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client.

*A.B.A. Standards for Criminal Justice* 4–5.2.(b) (2d ed. Supp.1986, Vol.I). Bailey and Fishman had a good working relationship, which included effective communication, with Farrah, and included Rothman, although they were not required to do so, throughout the trial. Thus, the court concludes that while Farrah, and Rothman, *may* not have viewed the relationship with Bailey and Fishman as meaningful, and *may* not have viewed the communication with them as effective, that is not the standard. Otherwise, a defendant would possess "unrestrained power to . . . discontinue the trial." *McKee v. Harris,* 649 F.2d 927, 932 (2d Cir.1981). Such power would be particularly problematical in the hands of a defendant like Farrah, whose current defense counsel is her fourth counsel or set of counsel during the course of the government's prosecution of her.[1]

1. The court counts Bailey and Fishman as one set of defense counsel, i.e., her second. Farrah initially retained Attorney Gerald Lefcourt, of New York, to represent her when she terminated the services of Bailey and Fishman; Lefcourt filed an appearance on February 25, 2000. However, she then terminated Lefcourt's services on May 26 and retained her current counsel.

## C. *Ineffective Assistance at Trial*

To demonstrate that she has been denied her Sixth Amendment right to effective assistance of counsel, a criminal defendant must show, under *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), "(1) that [her] attorney's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. O'Neil,* 118 F.3d 65, 71 (2d Cir.1997) (internal quotation marks omitted). The court assumes *arguendo* that this argument is properly before the court.[2]

Farrah fails to satisfy the first prong of the *Strickland* test because she cannot show that her attorneys' performance, or the performance of either of them, fell below an objective standard of reasonableness. First, Farrah fails to establish a factual predicate as to a number of her claims that her defense counsel gave her ineffective assistance. As to her claim that Bailey failed to cross-examine Poling regarding the two joint venture agreements executed by him, that factual contention is simply not true. As to the claim that defense counsel failed to call an expert witness to refute the government's expert witness on the issue of money laundering and the claim as to the DenJon account at Nations Bank, Farrah merely asserts that defense counsel's performance was deficient, without giving a factual basis for her contention that it was deficient. Farrah's contention that defense counsel failed to investigate Belden, Lyle and Kristan is not true. Also, the court has con-

2. The government notes, correctly, that the Second Circuit has held that a claim of ineffective assistance is not newly discovered evidence within the meaning of Rule 33 and therefore, does not provide grounds for a new trial under this rule. *United States v. Castillo,* 14 F.3d 802, 805 (2d Cir.1994); *United States v. Dukes,* 727 F.2d 34, 39 (2d Cir.1984). .

cluded on this record that the corporate tax returns, which Farrah argues would have been part of an effective defense for the federal income tax evasion counts, do not exist.

■ Second, as to Farrah's remaining contentions, the court concludes that "the quality of defense [counsels'] representation [was] within the range of competence reasonably expected of attorneys in criminal cases." *United States v. Dukes,* 727 F.2d 34, 41 (2d Cir.1984) (quoting *Trapnell v. U.S.,* 725 F.2d 149, 153 (2d Cir. 1983)). Farrah contends that Bailey's cross-examination of Poling should have been more effective. However, he cross-examined Poling extensively and covered thoroughly the area that Farrah contends was important. Farrah contends that the performance of defense counsel was deficient because they did not make an opening statement at either the beginning of the trial or at the beginning of the defense case. The court credits the explanation given by Bailey as to why this case was one where none of his criteria for giving an opening statement were satisfied. Obviously, other defense counsel might have chosen to proceed differently, but the court finds that the explanation given by Bailey, and the explanation attributed by Rothman to Fishman, as to why no opening statement was given, reflect the exercise of good judgment and sound discretion, particularly in view of the circumstances of this case. As to Fradette, it appears to the court that Bailey was most likely correct in reaching the conclusion he did, namely, that there was no useful purpose to be served by pursuing with Fradette the line of inquiry at issue here. Finally, as to defense counsels' decision not to call as defense witnesses Belden, Lyle and Kristan, Farrah has offered nothing to refute the explanation by Bailey as to why it would not have been helpful, on balance, to call any of these individuals. On the other hand, based on calling Boone and the fact that Farrah sent money to Boone, Bailey was able to argue plausibly to the jury that it

should have a reasonable doubt as to whether Farrah knew that the scheme at issue was fraudulent. The court credits Bailey's explanation and concludes that it reflects the exercise of good judgment and sound discretion.

### D. *The Inquiry at the In Camera Hearing*

■ Farrah argues that the court's inquiry into the conflicts of interest she alleged at the *in camera* hearing held just prior to trial was inadequate.

> To ensure that [a defendant's] right to conflict-free counsel is not abridged, a district court has "two distinct obligations" during criminal proceedings: (1) to initiate an inquiry whenever it is "sufficiently apprised of even the possibility of a conflict of interest," and (2) to disqualify counsel or seek a waiver from the defendant whenever the inquiry reveals that there is an actual or potential conflict. *United States v. Levy,* 25 F.3d 146, 153 (2d Cir.1994) ....
>
> To meet the first obligation, a court that learns of a possible conflict "must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *Id.*

*United States v. Rogers,* 209 F.3d 139, 143 (2d Cir.2000). Here the court concluded that there was no genuine conflict at all. The court has reconsidered this question in light of the additional arguments made by the defendant in connection with the instant motion. However, it still does not appear that Farrah's counsel had an actual or potential conflict of interest.

■ However, assuming *arguendo,* that Farrah's counsel, in fact, suffered from an actual or potential conflict, it appears that Farrah is entitled to relief only if she can show prejudice or adverse effect. *See Rogers,* 209 F.3d at 146 ("If the district court had fulfilled its initial obligation, yet made an inadequate inquiry or obtained a defective waiver, reversal would be appropriate only upon a showing of

prejudice or adverse effect."). Based on the discussion above of Farrah's various claims, the court concludes that Farrah cannot make the requisite showing of prejudice or adverse effect. The evidence was overwhelming that Farrah took money by fraud, laundered the money to conceal its origin and location, and subsequently evaded income taxes on the money. Audio tapes played at trial showed that she lied to a victim while using money for personal expenses and an extravagant lifestyle. Even if Bailey and Fishman had made different strategic choices as to precisely what questions were asked Poling on cross-examination, as to making an opening statement, as to whether to pursue further the cross-examination of Fradette, and as to whether to call Belden, Lyle and Kristan as defense witnesses, there is no reasonable probability that the jury would have had a reasonable doubt that Farrah was guilty. *See Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

### III. *CONCLUSION*

For the reasons set forth above, the defendant's motion for a new trial (doc. # 139) was denied.

It is so ordered.