**UNITED STATES of America,
Appellee,**

v.

**Alexander ROGERS, Defendant–
Appellant.**

**No. 44, Docket 98–1218.**

United States Court of Appeals,
Second Circuit.

Argued: Oct. 4, 1999

Decided: April 10, 2000

Alex V. Hernandez, Mark G. Califano, Assistant United States Attorneys, Bridgeport, CT (Stephen C. Robinson, United

States Attorney for the District of Connecticut, on the brief), for Appellee.

David A. Lewis, New York, N.Y. (The Legal Aid Society, Federal Defender Division, Appeals Bureau, on the brief), for Defendant–Appellant.

Before: JACOBS, CALABRESI and STRAUB, Circuit Judges.

JACOBS, Circuit Judge:

Alexander Rogers was convicted by a jury in the United States District Court for the District of Connecticut (Dorsey, *J.*) of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846. Between conviction and sentencing, Rogers discovered that his appointed defense counsel was serving as a City of New Haven police commissioner, and raised the issue of conflicted interest, asking that his counsel be dismissed. The district court denied Rogers's request and proceeded to sentencing.

On appeal, Rogers's new counsel argues that the conviction must be vacated and the case remanded for a new trial because the district court knew before trial that Rogers's appointed counsel was a New Haven police commissioner, ignored the conflict issue, and did not inform Rogers of it. We agree.

## BACKGROUND

Rogers's appointed trial counsel, Jonathan J. Einhorn, was simultaneously serving as one of six New Haven police commissioners whose role it is (i) to approve the police budget, (ii) to consult with the police chief about the department, (iii) to work with the police chief to make departmental rules and regulations, and to make and evaluate departmental policy, and (iv) to appoint, promote and remove police officers. We recount only the events and circumstances that may bear upon the conflict claim and that provide essential context.

A. *Offense, Search, Arrest and Indictment.*

On September 24, 1996, federal agents and officers from the New Haven Police Department appeared at Rogers's apartment in New Haven to execute arrest warrants for Gordon Lauria, Marcos Pappas and Alfred "Chicky" Bellucci. Rogers advised that he was alone and allowed Special Agent Michael Wardrop of the United States Drug Enforcement Administration to walk through the apartment (at his request) in order to confirm that no one else was there. Agent Wardrop found no one else, but as he walked around the apartment he spotted a closed-circuit television system, a pipe and a bottle of inositol, one use of which is to dilute cocaine.

Meanwhile, the same arrest warrants were being executed in a bar beneath Rogers's apartment, called Nancy's Café. After the two law enforcement groups consulted about their results, Agent Wardrop presented Rogers with a search consent form, which Rogers eventually signed after speaking with several of the agents and police officers. The search yielded a television monitor and four closed-circuit cameras, plastic sandwich bags, inositol, a police scanner, night-vision goggles, cheesecloth, high-power firecrackers, a pipe, silicate packaging and white powder that later tested positive for cocaine. Rogers was arrested.

Rogers, Lauria and Pappas were indicted for conspiracy to possess and distribute cocaine from December 1994 through September 24, 1996. The indictment also charged that Lauria and Pappas conspired to and (with Bellucci) did retaliate against a government witness.

B. *Motion to Suppress and Trial.*

The case proceeded to a joint trial against Rogers, Lauria and Pappas. Bellucci pled guilty to retaliating against a witness and cooperated with the government.

In a pre-trial motion to suppress the evidence seized from his apartment, Rogers argued that the search consent form was signed under duress exerted by the police. The district court did not credit Rogers's testimony, and denied the motion.

At trial, the following four government witnesses testified against Rogers:

1. Ronald Fassett, who agreed to cooperate with the government after pleading guilty to another drug conspiracy, testified that Lauria sometimes instructed him to get drugs from Rogers's apartment, where he would meet Rogers or other men named Gary or Eddie, and where he saw Lauria and Pappas "rerocking" (or cutting) cocaine while Rogers was on watch at the closed-circuit television cameras.

2. Edward Derenzo testified that he obtained drugs on four occasions by calling Rogers, who provided him with Lauria's beeper number. Lauria later told Derenzo to contact Rogers, and Rogers delivered the drugs to Derenzo near Nancy's Café.

3. Bellucci testified that beginning in August or September 1996, Bellucci frequented the apartment above Nancy's Café twice a day, where he would see Lauria and Pappas weighing and rerocking drugs while Rogers monitored the closed-circuit television cameras. On September 20, 1996, Bellucci flew into Newark Airport, was driven by Lauria and Rogers to Nancy's Café, and spent the following days driving Rogers around to drop off cocaine and to pick up money. On September 24, 1996, approximately one hour before his arrest, Bellucci was in the apartment and saw Lauria rerock cocaine in the presence of Pappas, Rogers and two customers.

4. Agent Wardrop testified about the September 24, 1996 search of Rogers's apartment.

The jury convicted Rogers, Lauria and Pappas of all charges on July 29, 1997.

C. *Motions and Sentencing.*

In August 1997, Rogers filed a *pro se* motion to dismiss counsel, alleging that he had insufficient opportunity to consult with Einhorn, that as a result the lawyer was unprepared for the suppression hearing and trial, and that Rogers was prejudiced by his lawyer's closing argument. *See United States v. Lauria,* No. 3:96CR185, Ruling on Alexander Rogers's Mot. to Dismiss Counsel, at 2 (D.Conn. Mar. 30, 1998). The district court denied the motion "based on defendant's allegations failing to demonstrate incompetence, ineffectiveness, nor prejudice to his case." *Id.*

On February 20, 1998, Rogers filed a second *pro se* motion (oddly enough, dated November 6, 1997) alleging that Mr. Einhorn had rendered ineffective assistance by reason of an actual conflict of interest. The motion explained that a week after the trial Rogers learned through an article in the *New Haven Register* that Einhorn was a New Haven police commissioner. Citing *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), Rogers argued that Einhorn's position on the board of police commissioners was an actual conflict of interest that had an adverse effect on the lawyer's performance. In particular, Rogers claimed that Einhorn resisted filing the suppression motion, failed to call New Haven Police Lt. William White during the suppression hearing, made an inadequate summation, and repeatedly advised Rogers to plea guilty and cooperate with the government. Rogers also argued that Einhorn violated his ethical obligation to advise him, and the court, of any possible conflict.

The district court's written opinion denying Rogers's motion, issued March 30, 1998, reasoned that "[e]ven if defense counsel's position on the Board of Police Commissioners could be viewed as an actual conflict with his representation of defendant, defendant must still show that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Lauria,* Ruling on Alexander Rogers's Mot. to Dismiss Counsel, at 2 (quoting *United States v. Stantini,* 85 F.3d 9, 16 (2d Cir.1996)).

The district court found no such adverse effect because Einhorn respected Rogers's decision to go to trial, filed the motion to suppress, attempted to call Lt. White at the suppression hearing, and made statements during summation that "can only be viewed as an attempt to help the defendant." *Id.* at 3.

At sentencing the following day, Einhorn reminded the court of the motions Rogers had made during the proceedings. The judge responded that he had reflected upon Rogers's motions, and said the record should not "in any way suggest, that I find that there's any deficiency on your part as far as your representation of [Rogers's] interests are concerned." *Lauria,* No. 3:96CR185, Sentencing of Alexander Rogers, at 29 (D.Conn. Mar. 31, 1998). Rogers then voiced his objection to the district court's denial of his second motion, emphasizing that if he had known before trial that Einhorn was a police commissioner, he would have moved to dismiss him as counsel at that time. The district court judge responded that he had been "thoroughly aware and familiar with the fact that Mr. Einhorn has been a police commissioner for several years." *Id.* at 32.

After some back and forth about how long Einhorn had been a police commissioner (not quite six years) and Einhorn's general involvement in New Haven city government, the judge observed, "The point is that, you know, he's not doing himself any favors, Mr. Rogers, by coming in here. The amount of money he gets for coming in as a defense counsel in these cases, it doesn't even cover his office expenses, frankly.... So therefore, he's not here to further the interest of the New Haven Police Department, and in many respects, on a totally altruistic and very highly and commendable, professional basis, he's trying to help you." *Id.* at 32–33. Rogers said he still "ha[d] a problem" with Einhorn's representation. *Id.* at 33.

Einhorn then explained the administrative and oversight roles of the board of police commissioners, emphasizing that "we have no involvement in actual crimes. I am not a policeman, so we have absolutely no involvement in criminal investigations." *Id.* at 34–35. Unpersuaded, Rogers repeated his objection to having a police commissioner as his lawyer, and cited Einhorn's alleged failure to put Lt. White on the stand at the suppression hearing or at trial.

Rogers was sentenced principally to 120 months in prison followed by five years of supervised release.

## DISCUSSION

■ A defendant's Sixth Amendment right to counsel includes a right to conflict-free representation. *See Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (citing *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)). To ensure that this right to conflict-free counsel is not abridged, a district court has "two distinct obligations" during criminal proceedings: (1) to initiate an inquiry whenever it is "sufficiently apprised of even the possibility of a conflict of interest," and (2) to disqualify counsel or seek a waiver from the defendant whenever the inquiry reveals that there is an actual or potential conflict. *United States v. Levy,* 25 F.3d 146, 153 (2d Cir.1994). "These obligations, which stem from the Sixth Amendment, arise whenever there is the possibility that a criminal defendant's attorney suffers from any sort of conflict of interest." *Id.*

■ To meet the first obligation, a court that learns of a possible conflict "must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *Id.* (citing *Strouse v. Leonardo,* 928 F.2d 548, 555 (2d Cir. 1991) and *United States v. Aiello,* 814 F.2d 109, 113 (2d Cir.1987)). "When a possible

conflict has been entirely ignored, reversal is automatic." *Id.* at 153–54 (citing *Cuyler,* 446 U.S. at 347, 100 S.Ct. 1708, and *Holloway,* 435 U.S. at 488, 98 S.Ct. 1173); *see also United States v. Kliti,* 156 F.3d 150, 153 (2d Cir.1998); *United States v. Jiang,* 140 F.3d 124, 127 (2d Cir.1998); *Ciak v. United States,* 59 F.3d 296, 304 (2d Cir.1995). In such circumstances, a defendant's conviction is vacated and his case remanded for a new trial with conflict-free counsel. *See, e.g., Ciak,* 59 F.3d at 304, 307.

## A. *Notice to the Court.*

The district court acknowledged at sentencing that Einhorn's service as a police commissioner was no surprise: the court was "thoroughly aware and familiar with the fact that Mr. Einhorn has been a police commissioner for several years."[1] *Lauria,* Sentencing of Alexander Rogers, at 32. Under *Levy*'s automatic reversal rule, we need not and do not decide whether Einhorn's role as a police commissioner amounted to an actual conflict. The dispositive question is whether the court's early knowledge that Einhorn was a police commissioner amounted to awareness of a possible conflict when considered in view of the circumstances then apparent.

■ For the reasons stated in the next segment of this opinion, we conclude that it did. But the court evidently discounted the likelihood that Einhorn's role as counsel would be impaired, assumed that Rogers would receive adequate representation (as the district court later found Rogers did in fact receive), and proceeded to trial without apprising Rogers or inquiring openly into the nature of the possible conflict—whether it was actual, whether it was potential and severe, whether it was waivable and waived, or whether it was insignificant. Unfortunately, this was in effect to "entirely ignore[ ]" a possible con-

flict of which the court was "sufficiently apprised." *Levy,* 25 F.3d at 153.

## B. *Possibility of Conflict.*

■ In light of the apparent issues and anticipated witnesses, the court's awareness that Einhorn was a police commissioner presented a non-frivolous conflict issue of a kind that created a duty of inquiry on the part of the district court. We need not decide whether a conflict in fact existed or, if it did, whether it was subject to waiver. At a timely hearing, that would have been decided and if a waiver could have obviated a conflict found to exist, a waiver could have been elicited and evaluated. We do decide that, on the facts apparent prior to trial, the possibility of conflict was sufficiently evident that pre-trial inquiry was required.

It is undisputed that during the time Einhorn represented Rogers, Einhorn was a member of the New Haven board of police commissioners, a body that exercises policymaking, budgetary and personnel powers over the New Haven Police Department. The Charter of the City of New Haven provides:

> There shall be in the department of police service a board of police commissioners consisting of six commissioners who shall advise and consult with the chief of police concerning matters pertaining to the chief's duties and to the conduct of the department, and together with the chief shall make all rules and regulations relating to the administration of the department which it may deem necessary or advisable, which rules shall be printed and made available to the public. In general, the board of police commissioners shall be responsible for policy making, with the advice of the chief of police, and for the evaluation of such policies.

New Haven, Conn., Charter art. XX, § 102. Further, as a matter of state law,

---

**1.** The government stated at oral argument that it was unaware of Einhorn's position as a police commissioner until after trial.

the board of police commissioners has "the sole power of appointment, promotion and removal" of police officers. Conn. Gen. Stat. § 7–276. Einhorn also stated that the board approves the police department budget. *See Lauria,* Sentencing of Alexander Rogers, at 35.

At the hearing conducted immediately prior to sentencing, the court addressed Einhorn and explained its view as to why no conflict existed:

> While your standing as a commissioner is another civic matter in which you have dedicated and committed substantial portions of your life to the community, for which you are to be commended, the fact is that I don't see a conflict because your role as a police commissioner, I don't find to have, in the first place, had any theoretical conflict with the function of the police officers that have been involved in the matter, nor have I observed any shortcoming in your conduct on behalf of Mr. Rogers of the defense of his case, in any way suggestive of your being deferential or preferential to the police at all. So you can rest assured, as far as that's concerned.

*Id.* at 29–30. This view confirms Einhorn's good faith; but that is not in issue. What matters is that a conflict was possible, as was confirmed by the events at trial, all of which were predictable or ascertainable at the outset.

Rogers argues that Einhorn's conflict was manifested by his failure to call New Haven Police Lt. White to the stand. Putting aside whether that would have been wise, Lt. White and New Haven Police Det. Robert Proto participated in the arrest and prosecution of Rogers, and their conduct predictably raised potential issues for trial.[2]

Rogers's motion to suppress was predicated on allegations of overreaching by New Haven police officers. He testified that the officers who arrested him threatened that he might be prosecuted for manufacturing pipe bombs before they asked him to sign the consent form. This alleged threat was the ground for Rogers's claim of duress. He also testified that when he initially refused to sign the consent form, Lt. White said, "Fuck him. We're gonna arrest him anyways and we're gonna get a search warrant."

Predictable lines of cross examination at trial would have also focused on the role of New Haven police officers. Fassett, who agreed to cooperate with the government after pleading guilty to another drug conspiracy, had met with Det. Proto. Derenzo testified pursuant to subpoena after meeting with Det. Proto. Bellucci testified pursuant to a cooperation agreement obtained after proffer sessions attended by Det. Proto and various Assistant United States Attorneys.

■ At sentencing, Einhorn conceded that the board of police commissioners approves the New Haven Police Department's budget and makes decisions regarding appointments, promotions and dismissals, "but we have no involvement in actual crimes. I am not a policeman, so we have absolutely no involvement in criminal investigations." *Id.* at 34–35. Einhorn added, "I don't have the foggiest notion, and none of the commissioners do, about any police activities, what investigations are ongoing, what have happened, what are happening. We're just like the board of finance or any of the municipal boards." *Id.* at 36.

Whatever force this explanation may have, it came after trial. And it fails to dispel the possibility of conflict. Commis-

---

2. The trial record refers to Det. Proto as a New Haven Police Department officer. On appeal, the government contends that Det. Proto was actually employed by the West Haven Police Department and was assigned to the New Haven Gang Task Force, composed of federal, state and local law enforcement officials. This is a matter that presumably would have been sorted out if a hearing had been held at the outset. Looking at the matter as it appeared to the court *ex ante,* we view Det. Proto as a New Haven police officer, as everyone did at trial and as may indeed be the case.

sioner Einhorn had responsibility for police policy, police personnel, the police budget and non-specific oversight. It is certainly possible that such responsibilities can produce an institutional loyalty. That effect is not necessarily detrimental to criminal defense. Institutional loyalty could impel a commissioner (variously) to root out abuses, or to avoid unfair attacks on the police, or to dampen suspicions that would be stirred in a lawyer who has no relationship with the police. If Einhorn had a divided loyalty, it is hard to say which way it cut, but it is enough to observe (as someone else has) that divided loyalties are rarely divided down the middle.

Given these circumstances, a possible conflict existed, prompting a duty of inquiry. Because the district court failed to perform this duty, we vacate Rogers's conviction pursuant to the automatic reversal rule set forth in *Levy*, 25 F.3d at 153–54.

### C. Post–Trial Evaluation of Conflict.

 The government argues that *Levy* does not mandate dismissal under the circumstances of this case because the district court did in fact evaluate the conflict—in response to one of Rogers's post-trial *pro se* motions—and found that Rogers suffered no adverse effect. This argument conflates the district court's initial inquiry obligation (as to which adverse effect is not at issue) with its second obligation to evaluate a conflict and ensure it is either eliminated or waived (an obligation as to which adverse effect can matter). *See id.* at 153. If the district court had fulfilled its initial obligation, yet made an inadequate inquiry or obtained a defective waiver, reversal would be appropriate only upon a showing of prejudice or adverse effect. *See United States v. Lussier*, 71 F.3d 456, 463 (2d Cir.1995) (citing *Levy*, 25 F.3d at 152). Absent the required initial inquiry, however, we have no occasion to consider whether there was an adverse effect; indeed, once it is established that a conflict was seen to be possible and was

ignored, we have no occasion to consider whether there was a conflict in fact.

This result is compelled by *Levy* and by the policy choice implicit in *Levy* that the Sixth Amendment right to non-conflicted counsel is most effectively implemented when the conflict inquiry is conducted sooner rather than later. True, it is easier after trial to identify specific trial episodes in which the conflict may have been in play, and a court can then decide if the defendant in fact suffered an adverse effect or prejudice. But the sorting out of the conflict issues after trial entails findings that, even if they are sound enough be sustained, represent intuitions about why some steps were taken and others forgone, and the impact of what happened. Inevitably, the post-trial inquiry opens avenues for undetected conflicts and constitutional harms that could be foreclosed at the outset by an informed waiver or a substitution of counsel. This Court therefore adopts and applies a firm preference for prophylactic inquiry, in which any conflict is identified and either eliminated or knowingly and voluntarily waived pre-trial, over an avoidably delayed and less certain inquiry after the fact.

Because the district court entirely ignored the possibility that Rogers's counsel was operating under a conflict of interest, this Court inquires no further.

### CONCLUSION

The judgment of the district court is vacated and the case is remanded for a new trial or other further proceedings.