******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, C. J., with whom ECKER, J., joins, concurring in the judgment. I join the majority's opinion insofar as it upholds the trial court's denial of the habeas corpus petition brought by the petitioner, Daniel Diaz, but reverses and remands the case to the Appellate Court for a corrected judgment.[1] See *Diaz* v. *Commissioner of Correction*, 200 Conn. App. 524, 554, 240 A.3d 795 (2020). I ultimately agree with the majority's conclusion that the petitioner failed to prove a violation of his right to the effective assistance of counsel under the sixth and fourteenth amendments to the United States constitution at his second criminal trial for the sale of narcotics on the ground that his criminal defense attorney, Frank Canace, labored under an actual conflict of interest given his concurrent employment as a New Haven police officer.[2] I write separately to highlight my concerns about the propriety of an active duty municipal police officer moonlighting as a criminal defense attorney, even in judicial districts located outside the municipality that officer serves. In my view, case law and ethics opinions endorsing this practice— including the one on which Canace relied in this case— are inconsistent with contemporary understandings of policing culture insofar as the attorney is left standing with one foot on either side of the "thin blue line" that is perceived to prevail between their loyalties to both their criminal defense client and their brother and sister officers. Nevertheless, I concur in the judgment of the majority because there is nothing in the record to indicate that the cultural nature of this conflict was raised or that it affected Canace's representation of the petitioner.

In my view, much of the fairly limited case law and ethics opinions that consider the potential conflicts arising from an active duty police officer concurrently serving as a criminal defense attorney unduly focus on jurisdictional, rather than cultural and psychological, boundaries in considering whether a conflict exists. One notable federal case, cited by both the majority and the Appellate Court, is *Paradis* v. *Arave*, 130 F.3d 385 (9th Cir. 1997), in which the habeas petitioner, Donald M. Paradis, challenged his state murder conviction on several grounds, including that "his trial counsel . . . suffered from a conflict of interest while acting as his appointed defense counsel during the criminal trial," insofar as the attorney was employed as a Coeur d'Alene city park police officer at the time of trial. Id., 391; see part II B 1 of the majority opinion; *Diaz* v. *Commissioner of Correction*, supra, 200 Conn. App. 550. Applying *Cuyler* v. *Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); see footnote 2 of this opinion; the United States Court of Appeals for the Ninth Circuit rejected Paradis' argument that the

attorney's employment as a city park police officer created a conflict of interest that rose to the level of a sixth amendment violation, emphasizing that there was "no showing that [the attorney] *actively represented* conflicting interests. Because the city police of Coeur d'Alene, let alone its park police, were not involved in the investigation of [the] murder, no conflict of interest flow[ed] eo ipso from [the attorney's] additional employment. Potentially divided allegiances do not constitute active representation of conflicting interests."[3] (Emphasis in original.) *Paradis* v. *Arave*, supra, 391; see *State* v. *Gonzales*, 483 So. 2d 1236, 1236–37 (La. App. 1986) (The court rejected the defendant's claim "that [his] court-appointed defense attorney was also a reserve police officer" whose "divided loyalties" created an actual conflict that adversely affected his performance under *Sullivan* because the "record . . . show[ed] a vigorous and competent representation by the defense counsel. Indeed it is [arguable] that the complained of conflict of interest worked to the [defendant's] benefit [because] counsel's knowledge of police procedures was an asset in developing the defense strategy."); cf. *Herring* v. *Secretary, Dept. of Corrections*, 397 F.3d 1338, 1355–58 (11th Cir.) (defense counsel's status as "special deputy sheriff" did not create impermissible conflict of interest because that status was granted as common professional courtesy to allow counsel to carry concealed firearm and counsel had no law enforcement certification, responsibilities or experience, rendering status "honorary" in nature, which counsel resigned when law changed to permit issuance of concealed carry permits), cert. denied sub nom. *Herring* v. *Crosby*, 546 U.S. 928, 126 S. Ct. 171, 163 L. Ed. 2d 277 (2005).

In *People* v. *Gelbman*, 150 Misc. 2d 466, 568 N.Y.S.2d 867 (Justice Ct. 1991), a municipal trial court granted a motion to disqualify a criminal defense attorney who was also a town police officer from representing a defendant in a criminal proceeding in that municipality's court. See id., 467, 469. The court relied on an ethics opinion stating that an attorney may not practice criminal law in the municipal courts "because it would be inappropriate for the [p]olice [o]fficer personally to represent criminal defendants" as, "no matter how earnest and complete a defense a lawyer provides, there is an obvious danger that a convicted defendant will believe that his defense was inadequate because of the lawyer's bias as a [p]olice [o]fficer. Conversely, the public might lose faith in the criminal justice system if it believes that the lawyer was employed in the hope that the lawyer's position as a [police officer] . . . might enable the lawyer to obtain a more lenient treatment for the defendant. A police officer is widely viewed as a representative of the [p]eople. [The court] believe[s] that the representation of a criminal defendant by a police officer could lessen public confidence in the integrity of the criminal justice system." (Internal quota-

tion marks omitted.) Id., 467–68. In *State* v. *White*, 114 S.W.3d 469 (Tenn. 2003), the court upheld the disqualification of a criminal defense attorney, who had been sworn in as an assistant county district attorney and who also served as a part-time prosecutor in municipal court, because the attorney's "dual roles as assistant district attorney general and defense counsel in the same county were inherently antagonistic and thus, created an actual conflict of interest." Id., 478. The court relied on the fact that the attorney's relationships with fellow prosecutors and police officers could be jeopardized insofar as "[z]ealous representation of criminal defendants very often will require . . . vigorous cross-examination of the testimony of such law enforcement personnel, and in many instances will require challenging the very laws the prosecutor is charged to enforce. Even if cross-examination of such personnel would not involve the disclosure of confidences and secrets of the state or municipality, the desire to maintain a harmonious working relationship with these law enforcement officers could adversely affect the inquiring attorney's zeal in conducting such cross-examination." (Internal quotation marks omitted.) Id. "The [d]isciplinary [r]ules preventing conflicts of interests were specifically designed to free the lawyer's judgment from such compromising interests and loyalties." (Internal quotation marks omitted.) Id.

Looking to ethics opinions,[4] I note that, in *In re Inquiry to Advisory Committee on Professional Ethics Index No. 58-91 (B)*, 130 N.J. 431, 432–34, 616 A.2d 1290 (1992), the New Jersey Supreme Court considered whether a police officer actively employed by the township of Cherry Hill, and his second employer, a law firm located in that municipality, could represent clients in criminal matters arising therein. The court considered rule 1.7 (c) (2) of the New Jersey Rules of Professional Conduct, under which "[a]ttorneys are disqualified from representing clients not only in cases of actual conflict, but also when representation begets an appearance of impropriety. Thus, multiple representation is impermissible 'in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.'" Id., 433. Recognizing the risk that a currently employed police officer could obtain "sensitive information about private parties," the court noted that its "overriding concern . . . for maintaining public confidence in the integrity of the legal profession" led it to conclude that, as long as the police officer attorney "remain[ed] a member of the Cherry Hill law enforcement team . . . no firm with which he is associated may represent private clients in Cherry Hill Municipal Court or in criminal matters arising in Cherry Hill." (Citation omitted; internal quotation marks omitted.) Id., 434. The court observed that the "appearance of

impropriety has special relevance for attorneys invested with the public trust, such as a government attorney or . . . an attorney who is a full-time police officer. . . . A municipal police officer, like a municipal attorney, is charged with major responsibilities in the effectuation of the criminal justice system at the local level—the apprehension and prosecution of violators of municipal ordinances as well as state criminal and quasi-criminal laws." (Citations omitted; internal quotation marks omitted.) Id., 435; see id., 433–34 (rejecting argument for application of exception for screening associates who are former government attorneys, given that attorney "seeks to hold two jobs, not leave government service to enter private practice").

In my view, where these authorities fall short in resolving the question of whether an active duty police officer is conflicted from service as a criminal defense attorney is their failure to consider the effect of what more contemporaneous scholarship has described as the culture of American policing—and the extent to which an active duty police officer seeking to represent a criminal defense client may consciously or unconsciously subscribe to, or be influenced by, that culture. Specifically, their sterile focus on jurisdictional boundaries appears to fail to account for the phenomenon, described in compelling detail in Professor Barbara E. Armacost's lead article in The George Washington Law Review, of "the 'brotherhood in blue' and the 'thin blue line' " that have come to characterize the "organizational cohesiveness" and "service culture" of American policing. B. Armacost, "Organizational Culture and Police Misconduct," 72 Geo. Wash. L. Rev. 453, 453–54 (2004). Professor Armacost summarizes "[t]he organizational theory literature [that] provides a theoretical framework for what police scholars have long recognized: police officers are enmeshed in a distinctive organizational culture that powerfully influences their judgment and conduct. Cops are much more likely to frame their decisions in terms of [role based] obligations and expectations than according to a simple analysis of the costs and benefits of their actions." Id., 509. "As a number of scholars have framed it, police officers have a distinctive 'working personality'—e.g., a set of 'distinctive cognitive and behavioral responses'—that derives from certain characteristics of the police milieu. The foundation for this so-called working personality is the street cop or the cop on the beat, which serves as the common background or training ground for virtually all police officers from patrolmen to police chief. . . . As police officers on the beat are exposed to certain common variables of police work, they develop distinctive patterns of coping with these variables, which in turn come to define a distinct occupational culture of policing." (Footnotes omitted.) Id., 512–13. Citing the work of Professor Jerome Skolnick,[5] Professor Armacost observes that "the police officer's role

contains two variables that are the primary determinants of the working personality of police officers: danger and authority. The danger entailed in police work—and the sense among police officers that they hold the thin blue line between order and disorder—makes police officers 'especially attentive' to any indication that violence or law breaking might be imminent." (Footnote omitted.) Id., 513. Further, the "other variable of police work, which reinforces this sense of isolation, is the element of authority. Police are empowered to intervene in a myriad of ways in the lives of ordinary citizens, from giving traffic citations, to maintaining order at public events, to enforcing public morality through enforcing laws pertaining to gambling, prostitution, and drunkenness. Police authority in these areas creates a *we/they* mentality, not only between the police and the criminal element, but also between the law enforcers and the general public." (Emphasis in original; footnote omitted.) Id.; see id., 513–14 ("when the policeman dons his uniform, he enters a distinct subculture governed by norms and values designed to manage the strain created by an outsider role in the community" (internal quotation marks omitted)). Ultimately, it is taken as an " '[article] of faith' in police culture" that "police officers consider themselves to be the 'thin blue line' between societal order and disorder. Like the rest of us, they see the negative effects of crime but, unlike the rest of us, they have the authority and power to do something about it." (Footnote omitted.) Id., 516–17. Professor Armacost also observes that the "call to do a potentially dangerous job involving conflicting demands and uncooperative or ungrateful citizens results in a sense of *us versus them* that develops between cops and the outside world. The bond resulting from this siege mentality—the so called 'brotherhood in blue'—creates a 'fierce and unquestioning loyalty to all cops, everywhere.' Along with the bond of solidarity is the sense that no one outside the ranks will really understand the realities of policing."[6] (Emphasis in original; footnotes omitted.) Id., 517.

Professor Seth W. Stoughton describes this culture as that of the warrior officer inherent in modern policing, which substantially derives from the militarization of police work as supported by federal initiatives that have equipped local police forces with "military-grade equipment and training" to support their roles as soldiers in the "wars on crime, drugs, and terror . . . ." S. Stoughton, "Principled Policing: Warrior Cops and Guardian Officers," 51 Wake Forest L. Rev. 611, 647 (2016); see id. ("[t]he metaphor was clear: police officers were soldiers, and their day-to-day job involved fighting on the front lines"). Officers who adopt the "[w]arrior" mindset view themselves as "the embodiment of the [t]hin [b]lue [l]ine, rather than the society that it protects . . . ." Id., 654. Professor Stoughton observes that, "[t]o those within the [w]arrior circle, only fellow [w]arriors

have the right to censure each other; but in reality even other officers—or former officers—are discouraged from doing so." (Footnote omitted.) Id., 664. Discussing, for example, review of use of force decisions, Stoughton notes: "Not only is second-guessing believed to be inappropriate, it is also viewed as an obstacle to effective policing. Questioning and criticism, in this worldview, are proximate to treason; calling an officer's capabilities or honor into doubt shakes that officer's resolve by making an [already difficult] duty even less attractive. This allegedly endangers officers and weakens the [t]hin [b]lue [l]ine between order and chaos."[7] Id., 665; see id., 666–67 (Professor Stoughton suggests that warrior culture "principles and value systems of policing" be replaced by "[g]uardian policing," which "seeks to instill officers with values that encourage public engagement, foster trust, and build lasting community partnerships. The result is safer and more effective law enforcement.").

I believe that aspects of the thin blue line culture of policing—particularly in a small state and in an age characterized by the instant sharing of information—may render it ethically and practically untenable for an active duty police officer to serve simultaneously as a criminal defense attorney, as it appears that the officer's loyalties will always be perceived to be in tension—even for those officers who make a conscious effort not to participate in that culture. At the very least, the apparent prevalence of the thin blue line renders disclosure, informed consent, and appropriate pretrial vetting paramount in cases in which a police officer attorney, who believes that he has eschewed participation in thin blue line culture, undertakes the representation of a criminal defense client. See, e.g., *State* v. *Davis*, 338 Conn. 458, 470–71, 258 A.3d 633 (2021). Ultimately, however, nothing in the record in this case, save for an oblique reference to the "goodwill" of Canace's fellow police officers in a section of a 1992 informal ethics opinion concerning the propriety of his representing clients in civil actions against individual members of the New Haven police department, touches on police culture. See Connecticut Bar Association Committee on Professional Ethics, Informal Opinion No. 92-04 (January 27, 1992). Because these cultural claims were not specifically raised before the habeas court, they cannot serve as a basis for overturning the petitioner's conviction, absent establishment of a record to the contrary.

Accordingly, I concur in the judgment reversing the Appellate Court's judgment dismissing the petitioner's appeal and remanding the case to that court with direction to affirm the judgment of the habeas court.

[1] Specifically, I agree with the majority's determination that the form of the Appellate Court's judgment, which dismissed the appeal rather than affirmed the judgment of the habeas court, was improper, thus requiring reversal and a remand for a corrected judgment.

[2] I agree with the majority's statement of the law with respect to conflicts of interest, namely, that, under *Cuyler* v. *Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), a defendant is required to prove "(1)

that [defense] counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his [counsel's] performance. . . . As we previously have explained, an attorney may be subject to conflicting interests when interests or factors personal to him [or her] . . . are inconsistent, diverse or otherwise discordant with [the interests] of his [or her] client . . . . To prove adverse effect, a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Davis*, 338 Conn. 458, 477–78, 258 A.3d 633 (2021); see id., 477–78 n.13 ("Prejudice may be presumed in some sixth amendment contexts, such as the actual or constructive denial of assistance of counsel altogether or various forms of state interference with counsel's assistance. . . . In the context . . . of counsel allegedly burdened by a conflict of interest . . . there is no presumption of prejudice per se. Prejudice is presumed only if the defendant demonstrates that counsel actively represented conflicting interests and that . . . conflict of interest adversely affected [counsel's] performance." (Internal quotation marks omitted.)); see also part II A of the majority opinion.

As we stated more than thirty years ago in a seminal conflicts decision by this court, "[a]t the core of the sixth amendment guarantee of effective assistance of counsel is loyalty, perhaps the most basic of counsel's duties. . . . Loyalty of a lawyer to his client's cause is the sine qua non of the [s]ixth [a]mendment's guarantee that an accused is entitled to effective assistance of counsel. . . . That guarantee affords a defendant the right to counsel's undivided loyalty." (Citations omitted; internal quotation marks omitted.) *Phillips* v. *Warden*, 220 Conn. 112, 136–37, 595 A.2d 1356 (1991), citing *Strickland* v. *Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and *Cuyler* v. *Sullivan*, supra, 446 U.S. 356 (Marshall, J., concurring in part and dissenting in part). "This requirement of loyalty carries with it the correlative duty of exercising independent professional judgment on the client's behalf, and both those duties are also reflected in the relevant disciplinary guidelines." *Phillips* v. *Warden*, supra, 137. "[A] lawyer shall not represent a client if . . . there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer." Rules of Professional Conduct 1.7 (a) (2). The commentary to rule 1.7 reinforces these ethical precepts. The commentary provides in relevant part that "[l]oyalty and independent judgment are essential elements in the lawyer's relationship to a client," that such loyalty is impaired "if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests," and that "[t]he lawyer's own interests must not be permitted to have an adverse effect on representation of a client." Rules of Professional Conduct 1.7, commentary; see *Phillips* v. *Warden*, supra, 138 (quoting pre-2007 revision of rule 1.7 and commentary thereto).

I similarly agree with the majority's conclusion that General Statutes § 54-1f (b)—which empowers a police officer to make warrantless arrests of persons whom "the officer has reasonable grounds to believe has committed or is committing a felony"—is discretionary rather than mandatory in nature and, therefore, did not create an inherent conflict of interest that is structural in nature, thus requiring per se invalidation of the petitioner's conviction as a result of his representation by Canace. See part II B 1 of the majority opinion.

[3] I note that one case from the United States Court of Appeals for the Second Circuit, *United States* v. *Rogers*, 209 F.3d 139 (2d Cir. 2000), considered the extent to which a criminal defense attorney's service as a city police commissioner created a conflict of interest for sixth amendment purposes. In *Rogers*, the defendant's trial attorney "was simultaneously serving as one of six New Haven police commissioners whose role it [was] (i) to approve the police budget, (ii) to consult with the police chief about the department, (iii) to work with the police chief to make departmental rules and regulations, and to make and evaluate departmental policy, and (iv) to appoint, promote and remove police officers." Id., 141. After he was convicted but before he was sentenced, the defendant himself alerted the District Court to his attorney's status as a police commissioner after learning about it through a newspaper article. He argued that, under *Cuyler* v. *Sullivan*, supra, 446 U.S. 335, his attorney's "position on the board of police commissioners was an actual conflict of interest that had an adverse effect on the lawyer's performance" because it led him to be hesitant to file a suppression motion or to call police witnesses, and further resulted in [his] making an "inadequate summation . . . and repeatedly advis[ing] [him] to plea[d] guilty and cooperate with the government. [The defendant] also argued that [counsel] violated his ethical obligation to advise him, and the

court, of any possible conflict." *United States* v. *Rogers*, supra, 142. The District Court found that there ultimately was no adverse effect on the attorney's performance, even if his position as a police commissioner was indeed an actual conflict, and reiterated that conclusion at sentencing, stating that the court had been aware of the attorney's police commissioner role for several years and that the attorney had provided professionally competent representation at trial, and crediting the attorney's statement that, as a commissioner, his responsibilities were "administrative and oversight," with no law enforcement responsibilities or participation. Id., 143. The Second Circuit, however, reversed the defendant's conviction under the automatic reversal rule of its decision in *United States* v. *Levy*, 25 F.3d 146, 153 (2d Cir. 1994), concluding that the District Court had failed to conduct the inquiry required by its awareness *before* trial of the possibility of a conflict created by the attorney's role as a police commissioner. See *United States* v. *Rogers*, supra, 143–44. Although the Second Circuit determined that the District Court's failure to inquire relieved it from having to decide whether the attorney's role as a police commissioner amounted to an actual conflict, the Second Circuit observed that, "[i]n light of the apparent issues and anticipated witnesses, the [District] [C]ourt's awareness that [the attorney] was a police commissioner presented a [nonfrivolous] conflict issue of a kind that created a duty of inquiry on the part of the [D]istrict [C]ourt." Id., 144. The court also observed that the attorney's posttrial explanations about the purely administrative role of the police commissioners "fail[ed] to dispel the possibility of conflict" because, as a police commissioner, the attorney "had responsibility for police policy, police personnel, the police budget and [nonspecific] oversight. It is certainly possible that such responsibilities [could] produce an institutional loyalty. That effect [was] not necessarily detrimental to criminal defense. Institutional loyalty could [compel] a commissioner (variously) to root out abuses, or to avoid unfair attacks on the police, or to dampen suspicions that would be stirred in a lawyer who has no relationship with the police. If [the attorney] had a divided loyalty, it is hard to say which way it cut, but it [was] enough to observe . . . that divided loyalties are rarely divided down the middle." Id., 145–46. Thus, the court held that "a possible conflict existed, prompting a duty of inquiry," and automatic reversal was required because "the [D]istrict [C]ourt failed to perform this duty . . . ." Id., 146; see id. ("[the court] therefore adopts and applies a firm preference for prophylactic inquiry, in which any conflict is identified and either eliminated or knowingly and voluntarily waived [pretrial], over an avoidably delayed and less certain inquiry after the fact").

[4] As the majority observes in part III of its opinion, it is well settled that "analogous" rules of professional ethics for attorneys "may be informative but are not determinative with respect to whether there is an actual conflict for [s]ixth [a]mendment purposes." *Perillo* v. *Johnson*, 205 F.3d 775, 798 (5th Cir. 2000); see, e.g., *United States* v. *Gallegos*, 39 F.3d 276, 279 (10th Cir. 1994); *United States* v. *Nissen*, 555 F. Supp. 3d 1174, 1190 (D.N.M. 2021); see also *Mickens* v. *Taylor*, 535 U.S. 162, 176, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) ("[t]he purpose of [the exception in *Sullivan*] from the ordinary requirements of *Strickland* . . . is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations [in which] *Strickland* itself is evidently inadequate to [ensure] vindication of the defendant's [s]ixth [a]mendment right to counsel"); *Nix* v. *Whiteside*, 475 U.S. 157, 165, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986) ("breach of an ethical standard does not necessarily make out a denial of the [s]ixth [a]mendment guarantee of assistance of counsel").

[5] See B. Armacost, supra, 72 Geo. Wash. L. Rev. 494 n.240, 513 nn.365–74, citing J. Skolnick, Justice Without Trial: Law Enforcement in Democratic Society (2d Ed. 1975) pp. 42–57.

[6] Professor Armacost further observed: "Cops are never told to be silent or to keep the agency's secrets. They never see an order upholding the code of silence that guides their working lives. There is no need to be explicit. The reactions, body language, whispered asides, and other rites of initiation convey what is expected. The code of silence serves to reinforce police bonds of solidarity, both of which make it difficult to investigate, with any accuracy, incidents that may involve mistakes or misbehavior." (Footnote omitted; internal quotation marks omitted.) B. Armacost, supra, 72 Geo. Wash. L. Rev. 517–18. With respect to the implementation of reforms targeted at corruption or excessive force, she observes that the "conflict in the police bureaucracy between a set of broader values and goals articulated in formal policies and the informal norms of [street level] police culture highlights the tension between means and ends, which is 'at the heart of police work.' " Id., 518; see id., 519 ("Institutional actors watch how other officers do things, and then they conform their own conduct to what they perceive as the norm. Even if police agencies have much the same formal rules, what differs

is what agencies actually tolerate, because that is how cops learn what the agency really accepts.").

[7] Ample additional scholarly literature supports the "thin blue line" aspect of police culture documented by the work of Professors Armacost and Stoughton. See, e.g., R. Cohen, "The Force and the Resistance: Why Changing the Police Force Is Neither Inevitable, nor Impossible," 20 U. Pa. J.L. & Soc. Change 105, 113–14 (2017) (advocating law enforcement culture change from adversarial "warrior" mindset, which is product of line of duty dangers, to "guardian" mindset by embracing procedural justice and activities to cultivate public trust); V. Johnson, "Bias in Blue: Instructing Jurors To Consider the Testimony of Police Officer Witnesses with Caution," 44 Pepp. L. Rev. 245, 292 (2017) (describing " 'us against them' mentality" among some police officers arising from "the view that the police are under assault by the community they are meant to serve," which renders "officers . . . prone to group polarization," with "tunnel vision" and "confirmation bias[es]" that are potentially exacerbated by other unconscious racial biases); J. Manly, Note, "Policing the Police Under 42 U.S.C. § 1983: Rethinking *Monell* to Impose Municipal Liability on the Basis of Respondeat Superior," 107 Cornell L. Rev. 567, 571 (2022) ("The police subculture plays a crucial role in police agencies, providing a way for officers to deal with social isolation from their communities while simultaneously promoting a bond of solidarity among the ranks. But while such a subculture may help officers cope with the unique stressors of policing, the detrimental impact that such a subculture has on society as a whole outweighs any benefit that may be derived from its existence. The police subculture—characterized by secrecy, mutual support, and officer unity—effectively creates a code of silence, known colloquially as the 'blue wall.' This code of silence, while acting to further reinforce solidarity among the ranks, results in 'an informal norm of police culture that prohibits reporting misconduct committed by other police officers.' Officers who violate this informal norm by reporting their colleagues' misconduct risk suffering serious personal and professional repercussions." (Footnotes omitted.)); S. Ricciardi, Note, "Police Misconduct in Connecticut," 47 Conn. L. Rev. Online 37, 44–45 (2015) ("The '[b]lue [w]all of [s]ilence,' also known as the '[c]ode of [s]ilence' or the '[b]lue [c]urtain,' is one of the most persistent obstacles in excessive force litigation. The idea of a code of silence is not completely unimaginable. Police officers are faced with life and death situations more frequently than the public likely realizes, and a certain level of trust is expected out of necessity. However, the brotherhood mentality that has formed over time has become a barrier to transparency. 'The code of silence, adhered to by any officer who intends to remain on the job, provides a virtually impenetrable layer of protection for [violence prone] officers.' " (Footnotes omitted.)).

---